**Rubylee DAVIS et al., Plaintiffs,**

v.

**George W. ROMNEY, individually and in his capacity as Secretary of Housing and Urban Development, et al., Defendants.**

**Civ. A. No. 71–198.**

United States District Court, E. D. Pennsylvania.

Feb. 13, 1973.

---

58. PPM 20–8, ¶ 8.a(3).

See also, D.C., 55 F.R.D. 337.

32

George D. Gould, Community Legal Services, Inc., for plaintiffs.

Louis C. Bechtle, U. S. Atty., Malcolm Lazin, Asst. U. S. Atty., Philadelphia, Pa., for defendants.

OPINION

JOHN MORGAN DAVIS, District Judge.

Presently before this Court are two motions, defendant's Motion to Dismiss filed pursuant to Rule 12(b) Fed.R.Civ. P. and plaintiff's Motion for Partial Summary Judgment filed pursuant to Rule 56 Fed.R.Civ.P.

Plaintiffs have filed suit on behalf of themselves as individuals and as members and representatives of all indigent residents of Philadelphia who have purchased, are in the process of purchasing,

or may purchase in the future existing houses through mortgages insured by the Federal Housing Authority (hereinafter F.H.A.) under § 235 and § 221(d)(2) of the National Housing Act. Defendants are those individuals who are responsible for implementation of this legislation, commonly known as the 235 and 221(d)(2) Existing House Programs, in Philadelphia. The United States of America is also a named defendant.

In their Complaint, plaintiffs seek injunctive and declaratory relief to compel the defendants to insure only those mortgages under § 235 and § 221(d)(2) which are secured by properties which comply with the Philadelphia Housing Code. Further plaintiffs seek damages and injunctive relief to redress the violation of rights secured by these sections and the appointment of a master pursuant to Rule 53 Fed.R.Civ.P. to adjudicate the amount of damages in each individual case. Jurisdiction is alleged under 28 U.S.C. § 1361 (action in the nature of mandamus against federal officials), under 5 U.S.C. §§ 702–4 (action for judicial review of federal agency decisions), under 28 U.S.C. § 1337 (action arising under statutes regulating commerce), under 28 U.S.C. §§ 2201–2 (action for declaratory relief), and under 28 U.S.C. § 1346(a)(2) (action for certain claims against the government, commonly called the Tucker Act).

By their Motion to Dismiss, Defendants contend (1) that this Court does not have jurisdiction to order injunctive or declaratory relief or to grant the right to relief under the Tucker Act, and (2) that plaintiffs have failed to exercise their administrative remedies under 12 U.S.C. § 1735b(b), § 518(b) of the National Housing Act, rendering this Court without jurisdiction to hear plaintiff's claims for monetary damages at this time.

By their Motion for Partial Summary Judgment plaintiffs seek (1) a declaratory judgment that the 235 and 221(d)(2) Existing House Programs require properties to be in compliance with local housing and other codes as a condition for insuring the mortgage, (2) a writ in the nature of Mandamus and a permanent injunction requiring the individual defendants to insure only those mortgages under the 235 and 221(d)(2) Existing House Programs which are secured by properties which comply with the Philadelphia Housing Code, and (3) the right to damages from defendant United States in an amount which will enable them to correct all Philadelphia Housing Code violations existing at the time of the mortgage insurance commitment.

The Complaint before this Court arises from those provisions of § 235 and § 221(d)(2) which are designed to assist members of the lower economic strata of our society in the purchase of rehabilitated existing houses. Other provisions of these sections permit low income families to purchase new homes or memberships in cooperatives. These two sections were amendments to the National Housing Act, § 235 being enacted in 1968, 12 U.S.C. § 1715z(i)(2), and § 221(d)(2) being enacted in 1961, 12 U.S.C. § 1715(*l*)(d)(2).

Two qualifications must be met by a family in order to obtain a house under the 235 Existing House Program (1) It must have an income not exceeding 135 percent of the income of the same size family eligible to move into local public housing, and (2) it must have an acceptable credit rating. If determined to be eligible and F.H.A. funds are available, the family can receive a mortgage not exceeding $18,000–$20,000, depending upon its size and other special circumstances. The family must make a minimum down payment of $200.00 on the house and pay a mortgage insurance premium not to exceed $\frac{1}{2}$%.

The family can also receive a mortgage subsidy which may reduce the interest charges on the mortgage to 1%. The responsibility for administration of this program is delegated to the Commissioner of the Federal Housing Authority by the Secretary of Housing and Urban Development.

Section 221(d)(2) is similar to § 235 but is geared to low and moderate income families, the maximum income allowed being higher than that established under the 235 program. If approved, the family can get a mortgage of $18,000 to $21,000, as with the 235 program, but must make a minimum down payment of 3% of the purchase price. The 221(d)(2) program unlike the 235 program does not provide for a mortgage interest charge subsidy.

To obtain an F.H.A. insured mortgage under § 221(d)(2) or § 235 of the National Housing Act an application must be made to the Philadelphia Office of the F.H.A. When this initial contact is made, the Philadelphia Office sends out an appraiser, either a member of the staff or a "fee appraiser", an individual employed on a part time basis and paid a flat rate per appraisal, who estimates the value of the property. After the appraisal, the Philadelphia Office will issue a "conditional commitment", a statement which indicates the F.H.A.'s estimate of the value of the property and sets the maximum amount of loan it will issue for an acceptable purchaser. If the appraiser notices serious defects he may add on the conditional commitment a list of repairs which must be made as a condition for obtaining mortgage insurance. He may also require, if necessary, certificates as to lack of termites and the adequacy of heating, plumbing, electrical systems, and the roof. Upon determination that the purchaser is eligible and the F.H.A. has available funds, a firm commitment to insure the mortgage on the property is issued. At closing, or just before, the certifications are transmitted to the mortgagee and sent to the Philadelphia Office with other closing documents. On the basis of these documents, the F.H.A. insures the mortgage on the property.

The allegations made in the Complaint as to plaintiffs' common home buying experience can be summarized as follows. Plaintiffs are inexperienced home buyers, none of whom has ever owned a home previously. They are desperate for safe and adequate housing due to the lack of decent housing in Philadelphia. Attracted by the promise of the 235 and 221(d)(2) Existing House Programs, with their liberal credit arrangements, they consult with real estate brokers who often use the term "F.H.A. approved" or the expression "the Federal Government will stand by it", to create interest in a particular house. After their interest is thus aroused, they are shown houses which are substandard as defined by the Philadelphia Housing Code. Since the inspections are often cursory and conducted by brokers using a hard sell technique, they do not easily or often reveal defects to the inexperienced purchaser. Some defects are latent, and some impossible for the purchaser to detect because they involved utilities which had been shut off. Such defects as are discovered are often explained away or represented by the real estate agent as repairs which the F.H.A. will require the seller to make or which the seller plans to make before he moves. Sometimes the real estate agents manage to prevent the purchaser from seeing all or part of the house before settlement. At closing the purchaser, usually not represented by an attorney, is told that the house is "F.H.A. approved." Only when he finally moves in does the purchaser realize that ignorance, need, and insidious business tactics have combined to place him in a house that does not meet his aspirations or his expectations.

The result is that plaintiffs find themselves in houses with local housing and other code violations ranging from minor violations to major structural, heating, electrical, plumbing and health violations which render them unfit for human habitation and dangerous to the health and safety of the occupants. The responsibility for these conditions they attribute to the practices and procedures of the Philadelphia Office of the F.H.A. Primarily they challenge defendants' use of Chapter IV of the F.H.A. Minimum Property Standards, "General Acceptability Criteria" (F.H.A. No. 300) and the stated objectives contained in that publi-

cation to determine eligibility for an insured mortgage rather than local housing codes. In line with this plaintiffs contend (1) that the F.H.A. staff and fee appraisers are not trained or sufficiently knowledgeable to be able to determine whether a property meets local housing and other code standards or even whether it meets the standards the F.H.A. has established; (2) that the F.H.A. and fee appraisers often overlook obvious defects; (3) that the actual practices and policies of the Philadelphia Office of the F.H.A., its staff and fee appraisers are so vague, incomplete and inconsistent as to render almost impossible F.H.A.'s following the standards for eligibility which it has adopted; and (4) that the Philadelphia Office of the F.H.A. has been aware that the F.H.A. is insuring substandard housing but instead of trying to rectify the situation has attempted to cover up their administration of the 235 and 221(d)(2) Existing House Programs.

We shall first consider the injunctive and declaratory relief aspects of the Motion for Partial Summary Judgment initially weighing the jurisdictional issues defendants have raised in their Motion to Dismiss. We shall then take up the damages aspect of the case again weighing first the jurisdictional question.

## I. DECLARATORY AND IN-JUNCTIVE RELIEF

### A. STANDING.

■ Although the issue of standing has not been raised directly by the defendants, it serves as the central theme of their arguments to dismiss plaintiffs' prayer for declarative and injunctive relief. It is incumbent, therefore, upon this Court to consider plaintiff's "standing" before delving into the specific jurisdictional challenges raised by the defendants. The Supreme Court has held that two elements are necessary to sustain "standing" in any particular case. Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); Association of Data Processing Services Organizations, Inc. et al. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

■ The first element is derived from Article III of the Constitution which restricts the exercise of Judicial power to "cases" and "controversies." Simply stated, the plaintiff must allege that he has suffered a wrong, economic or otherwise, which will give him "some personal stake in the outcome of the litigation." Norwalk Core v. Norwalk Redevelopment Authority, 395 F.2d 920, 927 (1st Cir. 1968). In Association of Data Processing, 397 U.S. 150, at 151–152, 90 S.Ct. 827, at 829, 25 L.Ed.2d 184 the Court approved a statement made earlier in Flast v. Cohen, *supra*:

> "[I]n terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution."

Similarly, the Court in *Flast*, by quoting from an earlier Opinion reiterated that:

> The "gist of the question of standing" is whether the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." Baker v. Carr, 369 U.S. 186, 204, [82 S.Ct. 691, 7 L.Ed.2d 663] (1962).

392 U.S. at p. 99, 88 S.Ct. at p. 1952. Standing does not contemplate what a plaintiff's legally protected interests may be on the merits or whether the controversy is otherwise justiciable but only "whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue." Flast v. Cohen, *supra*, 392 U.S. at 99–100, 88 S.Ct. at 1952.

The United States Court of Appeals for the Third Circuit has devised the "in-

jury in fact" test for determining whether a particular plaintiff's Complaint confirms with the dictates of Article III. In Shannon v. HUD, 436 F.2d 809 (3rd Cir. 1970), the Court granted standing to plaintiffs, who were residents, businessmen, and representatives of civic groups challenging the approval of a housing project site on the grounds that HUD did not, and had no means by which to, consider its effects on community racial concentration. The Court in rejecting defendants' argument that plaintiffs' interest was too remote, held:

> The defendants point out that the instant plaintiffs are neither displaced residents nor potential occupants and that the HUD action which they challenge was not taken under the Model Cities statute. Such persons, they say, have too remote an interest to confer standing on them to challenge these administrative actions. We do not agree. Certainly, the dispute which they seek to have adjudicated will be presented in an adversary context. Flast v. Cohen, 392 U.S. 83, 101, 88 S. Ct. 1942, 20 L.Ed.2d 947 (1968). The test, for Article III purposes, is whether or not plaintiffs allege injury in fact. They do indeed. They allege that the concentration of lower income black residents in a 221(d)(3) rent supplement project in their neighborhood will adversely affect not only their investments in homes and businesses, but even the very quality of their daily lives.

[436 F.2d 809, 818]

In the Complaint before this Court, the plaintiffs have alleged "injury in fact." They complain that defendants' actions have caused them to purchase and live in inadequate and substandard houses, which now require substantial repairs not only to bring them into conformity with the local housing codes but also to render them healthy and safe places in which to live. The necessary repairs will cost money, the lack of which is the prerequisite to being eligible for the 221(d)(2) and 235 programs in the first place. Plaintiffs also complain of injuries of a noneconomic nature. The dream of the pride and dignity that would inure from home ownership has been shattered and destroyed; in its place has been substituted the nightmare of the two options open to them: live in the homes as they are, or move and lose the investment already made. It is clear to this Court that the plaintiffs have presented in their Complaint the requisite "personal stake in the outcome" of the suit to satisfy Article III. Baker v. Carr, *supra*, 369 U.S. at 204, 82 S.Ct. 691 (1962).

■ The second element that must be present to achieve standing concerns the question "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Data Processing, supra*, 397 U.S. at 153, 90 S.Ct. at 830. This "zone of interest" test was designed to replace the "legal right" test which the Court recently held to go to the merits of the case rather than to the preliminary issue of standing. *Id.*, at 153, 90 S.Ct. 827. The old test was quite strict, denying standing to any plaintiff "unless the right invaded [was] a legal right, one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege." Tennessee Power Co. v. T. V. A., 306 U.S. 118, 137, 59 S.Ct. 366, 369, 83 L.Ed. 543. Under the "zone of interest" test, any interest which a statute may contemplate, be it economic or otherwise, can serve as a basis for standing to seek the protection of that statute. " '[A]esthetic, conservational, and recreational,' as well as economic" are among the diverse values which may be encompassed within the "zone of interest." Scenic Hudson Preservation Conference v. F. P. C., 354 F.2d 608, 616 (2 Cir. 1965), cert. denied Consolidated Edison Co. v. Scenic Hudson Preservation Conference, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1965). See also Office of Communication of United Church of Christ v. F. C. C., 123 U.S. App.D.C. 328, 359 F.2d 994 (1966);

*Data Processing, supra.* Even spiritual values have been deemed sufficient to give standing to raise issues touching upon the Establishment Clause and the Free Exercise Clause. Abington School District v. Schempp, 374 U.S. 203, 83 S. Ct. 1560, 10 L.Ed.2d 844 (1962). What must be found in any action is simply a "nexus" between the status of the plaintiff and the "precise nature" of the statutory infringement alleged. Flast v. Cohen, *supra*, 392 U.S. at p. 102, 88 S.Ct. 1942, 20 L.Ed.2d 947. In Western Addition Community Organization v. Weaver, D.C., 294 F.Supp. 433, 443 (1969), vacated for other reasons, D.C., 320 F. Supp. 308 (1968), the Court noted:

> In the recent case of Hardin v. Kentucky Utilities Co., 390 U.S. 1, 5–7, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968) the Supreme Court, dealing with the Tennessee Valley Authority Act, has made clear that, when a statute clearly reflects a Congressional purpose to protect the interests of a particular class, persons within that class have standing to require compliance with the statute.

Whether or not a particular group was intended to be the primary beneficiaries of a statute is of no moment to the question of whether they fall within the "zone of interest". As the Circuit Court of the District of Columbia stated in Peoples v. United States Department of Agriculture, 138 U.S.App.D.C. 291, 427 F.2d 561, 563–564 (1970):

> Recent Supreme Court precedents, and underlying principles . . . establish a presumptive standing . . which permits a complaint, alleging that executive programs unlawfully deviate from statutory requirements, to be filed by those who were intended beneficiaries of the statutory provisions, even though they are not the primary beneficiaries of the statute.

\* \* \* \* \* \*

The principles of standing discussed above establish the standing of poor people to complain of illegal departures by the Secretary from the Congressional Plan, since they are an intended beneficiary of Congress, and this principle is neither undercut by the fact that the farmers were also beneficiaries, nor dependent on some process of appraisal to determine whether the poor people weighed heavier in the scales than the farmers, or which should be labeled the "primary" beneficiaries.

See also Flast v. Cohen, *supra*.

■ The Courts have recognized the interest of various groups when the issue of Urban renewal and housing is concerned. As we have noted above, the Third Circuit Court of Appeals in Shannon v. HUD, *supra* held that plaintiffs, who were residents, businessmen, and representatives of civic groups, had the right to challenge the procedures surrounding the adoption of an urban renewal project. The court stated 436 F.2d at 818:

> The plaintiffs here, perhaps more than the displaced and relocated former residents or the potential occupants of new housing, are vitally affected by the adequacy of the particular program of community improvement for the preservation of a residential community with decent homes and a suitable living environment which they seek to challenge.

See also Northwest Residents Association v. Department of Housing and Urban Development, 325 F.Supp. 65 (E.D. Wisc.1971). Residents, of urban renewal areas have been granted standing to challenge the adequacy of provisions adopted under the Housing Act of 1949 for relocation of displaced persons upon Court findings that it was intended for their benefit. Powelton Civic Home Owners Association v. Department of Housing and Urban Development, D.C., 284 F.Supp. 809; Norwalk CORE v. Norwalk Redevelopment Authority, 395 F.2d 920 (2nd Cir. 1968); Western Addition Community Organization v. Weaver, *supra*.

Turning to the National Housing Act of which § 235 and § 221(d)(2) are but

a part we note that it contains the following declaration of policy:

> The Congress affirms the national goal, as set forth in section 1441 of Title 42, of "a decent home and a suitable living environment for every American family."
>
> The Congress finds that this goal has not been fully realized for many of the Nation's lower income families; that this is a matter of grave national concern; and that there exist in the public and private sectors of the economy the resources and capabilities necessary to the full realization of this goal.
>
> The Congress declares that in the administration of those housing programs authorized by this Act which are designed to assist families with incomes so low that they could not otherwise decently house themselves, and of other Government programs designed to assist in the provision of housing for such families, the highest priority and emphasis should be given to meeting the housing needs of those families for which the national goal has not become a reality; and in the carrying out of such programs there should be the fullest practicable utilization of the resources and capabilities of private enterprise and of individual self-help techniques.

[12 U.S.C. § 1701t]

This declaration demonstrates Congress' intention to include persons such as the plaintiffs amongst the beneficiaries of the National Housing Act and to place them within the groups whose interests it protects. From the wording of the National Housing Act and from the wide variety of interests that the Courts now recognize, we find that the plaintiffs in the case at bar are within the "zone of interests" sought to be protected by it. Plaintiffs are the ones who have primary interest in their housing needs, which is the whole purpose of Act, to provide them with safe adequate housing at a price which is within their limited means. No other group, but the plaintiffs, surely not the real estate brokers or the mortgagees or the contractors, can be considered so concerned about seeing the mandate of Congress as expressed in the National Housing Act is carried forth and faithfully so. No other group but the plaintiffs can be adversely affected by disregard for the provisions of the Act. If the Act does not function properly or is not administered properly, they are the first to suffer.

The plaintiffs certainly have at least the same interest in a housing program as the Court found the plaintiffs in *Peoples* to have in the Food Stamp Act. 7 U.S.C. § 2011 et seq. Both cases involve conditions vital to survival, in *Peoples*, food, in the case at bar, housing. If an interest in food is sufficient for standing so too must be shelter.

Having satisfied the two requisite elements the plaintiffs have standing to bring the action at bar.

### B. JURISDICTION–28 U.S.C. § 1361.

Plaintiffs allege jurisdiction under § 1(a) of the Mandamus and Venue Act of 1962, 28 U.S.C. § 1361 which provides, to wit:

> The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

This Statute grants to all federal district courts the power to issue mandamus against federal officials. Prior to its passage as a result of two early Supreme Court decisions, McIntire v. Wood, 11 U.S. (7 Cranch) 504, 3 L.Ed. 420 (1813) and Kendall v. United States ex rel. States, 37 U.S. (12 Pet.) 524, 9 L.Ed. 1181 (1838), only the federal district court for the District of Columbia had mandamus jurisdiction, Marshall v. Crotty, 185 F.2d 622 (1st Cir. 1951). This Statute was not intended to enlarge or alter the scope of mandamus as it had been previously exercised in the District of Columbia but merely to broaden venue of mandamus relief. Sprague

Electric Co. v. Tax Court of United States, 230 F.Supp. 779 (D.C.Mass.1964) affirmed 340 F.2d 947 (1st Cir. 1965).

In Work v. United States ex rel. Rives, 267 U.S. 175, 45 S.Ct. 252, 69 L.Ed. 561 (1925), Chief Justice Taft noted the scope of Mandamus when he stated at 177–178, 45 S.Ct. at 252:

> Mandamus issues to compel an officer to perform a purely ministerial duty. It cannot be used to compel or control a duty in the discharge of which by law he is given discretion. The duty may be discretionary within limits. He can not transgress those limits, and if he does so, he may be controlled by injunction or mandamus to keep within them.

This approach to mandamus has been followed elsewhere notably in Harmon v. Brucker, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958) wherein the respondent contended that the type of military discharge received by the petitioner was exclusively an administrative procedure and the courts were without jurisdiction to review the decision. The Court, disagreeing with this position, stated at pp. 581–582, 78 S.Ct. at p. 435:

> Generally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers. American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 108 [23 S.Ct. 33, 47 L.Ed. 90]; Philadelphia Co. v. Stimson, 223 U.S. 605, 621–622 [32 S.Ct. 340, 56 L.Ed. 570]; Stark v. Wickard, 321 U.S. 288, 310 [64 S.Ct. 559, 88 L.Ed. 733]. The District Court had not only jurisdiction to determine its jurisdiction but also power to construe the statutes involved to determine whether the respondent did exceed his powers. If he did so, his actions would not constitute exercises of his administrative discretion, and, in such circumstances as those before us, judicial relief from this illegality would be available.

Other recent cases have perpetuated this approach to mandamus. In Nixon v. Secretary of Navy, 422 F.2d 934, 940 (2nd Cir. 1970) another case involving the exercise of discretion by the military, the Court stated:

> This is an administrative practice which is to be commended rather than condemned, so long as the classification of those ineligible for cancellation has a reasonable and logical basis, such as getting a fair return in longer service from those who have sought and received costly specialized training, and is not *simply arbitrary*. See K. Davis, Discretionary Justice 97–114 (1969). [Emphasis added]

This case was cited in an even later decision, Fifth Avenue Peace Parade Committee v. Hoover, 327 F.Supp. 238, 242 (S.D.N.Y.1971) wherein the Court noted:

> Normally, acts of discretion are not subject to mandamus, although officials may occasionally go so far beyond their discretion as to warrant judicial interference.

See also Peoples v. United States Department of Agriculture, *supra*; Ashe v. McNamara, 355 F.2d 277 (1st Cir. 1965); Lima v. Secretary of Army, 314 F.Supp. 337 (E.D.Pa.1970). One recent case Prairie Bank of Pottawatomie Tribe of Indians v. Udall, 355 F.2d 364 (10 Cir. 1966), cert. denied 385 U.S. 831, 87 S.Ct. 70, 17 L.Ed.2d 67 (1966), appears upon a cursory reading to be contrary to the holdings of the cases cited above with regard to situations involving discretion. Although the administrative action involved was deemed discretionary by the Court, the issue of abuse of discretion was not even raised. Thus, the decision by the Court cannot be considered out of step with the decisions we have noted.

█ Clearly from the decisions quoted and cases cited above, this Court can act when it finds government officials failing to fulfill their ministerial functions or abusing their discretion. Plaintiffs' allegations can be interpreted in one of two ways (1) That the defendants have flagrantly abused the discre-

tion vested in them to approve houses for F.H.A. insured mortgages by approving houses which fall without the local housing ordinances or (2) that the defendants have not performed their ministerial duty to approve only houses which meet the standards of local housing ordinances. Either way, defendants are subject to mandamus if the allegations are correct because mandamus is the proper form of relief in both interpretations.

Defendants contend that Title I of the Housing and Urban Development Act of 1968, which comprises part of the National Housing Act, allows the Secretary of Housing and Urban Development to insure mortgages on existing houses "if the units meet standards prescribed by the Secretary." However, in quoting this phrase they do not cite the subsection from which it comes and we cannot find in Title I this phrase or a similar one which is intended to counter the clear language of § 221(d)(2), which is incorporated by reference in § 235, that properties upon which mortgages are being insured meet local housing codes.

Defendants also contend that they owe no duty to the plaintiffs per se under the National Housing Act which can be compelled through Mandamus. Title 28 U.S.C. § 1361 provides that a court has jurisdiction where there is "a duty owed to the plaintiff." As we have already demonstrated in our discussion above on standing, low income purchasers are if not the primary at least the intended beneficiaries of the 221(d)(2) and 235 Existing House Programs. Since the plaintiffs' interest fall within the "zone of interests" sought to be protected by the act, clearly the duties placed upon the defendants run to the plaintiffs as well as anyone else who falls within the same zone. See Peoples v. United States Department of Agriculture, *supra*.

■ This Court has jurisdiction under 28 U.S.C. § 1361 to determine whether declaratory and injunctive relief should be granted.

## C. JURISDICTION–5 U.S.C. §§ 702–704.

Plaintiffs also allege jurisdiction under the Administrative Procedure Act 5 U.S.C. § 701 et seq., specifically §§ 702–704. § 702 provides to wit:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

§ 703 provides to wit:

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

§ 704 provides, to wit:

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

■ Defendants counter by arguing that plaintiffs must show that they have

been adversely affected "within the meaning of any relevant statute." Braude v. Wirtz, 350 F.2d 702 (9 Cir. 1965). Whether a party can be considered aggrieved under a particular statute goes to the issue of standing, which we have extensively considered above and resolved in favor of the plaintiffs. Since the plaintiffs fall within the "zone of interests" sought to be protected by the National Housing Act, it clearly follows that they can be aggrieved by its misinterpretation or misapplication.

 Recent case law has established that the Administrative Procedures Act can serve as an independent basis of federal jurisdiction. In Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) the Supreme Court established the presumption in favor of finding jurisdiction under the Administrative Procedures Act when it stated pp. 140–141, 87 S.Ct. at p. 1511:

> The Administrative Procedure Act provides specifically not only for review of "[a]gency action made reviewable by statute" but also for review of "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704. The legislative material elucidating that seminal act manifests a congressional intention that it cover a broad spectrum of administrative actions,[2] and this Court has echoed that theme by noting that the Administrative Procedure Act's "generous review provisions" must be given a "hospitable" interpretation. Shaughnessy v. Pedreiro, 349 U.S. 48, 51 [75 S.Ct. 591, 99 L.Ed. 868]; see United States v. Interstate Commerce Comm'n, 337 U.S. 426, 433–435 [69 S.Ct. 1410, 93 L.Ed. 1451]; Brownell v. Tom We Shung, 352 U.S. 180 [77 S.Ct. 252, 1 L.Ed.2d 225]; Heikkila v. Barber, 345 U.S. 229 [73 S.Ct. 603, 97 L.Ed. 972], again in Rusk v. Cort, 369 U.S. 367 at 379–380 [82 S.Ct. 787, 7 L.Ed.2d 809], the Court held that only upon a showing of "clear and convincing evidence" of a contrary

legislative intent should the courts restrict access to judicial review. See also, Jaffe, Judicial Control of Administrative Action 336–359 (1965).

From this has followed a group of cases which have found jurisdiction under 5 U.S.C. §§ 702–704. See for example Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Northwest Residents Association v. Department of Housing and Urban Development, *supra;* Citizens Committee for Hudson Valley v. Volpe, D.C., 302 F.Supp. 1083 (1969), aff'd 425 F.2d 97 (2 Cir. 1970), cert. denied Parker v. Citizens Committee, 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256 (1970). Western Addition Community Organization v. Weaver, *supra.* We note the wording of the Court's Opinion in *Northwest Residents Association,* 325 F.Supp. at 67:

> [N]umerous recent cases have either expressly or implicitly held that the Administrative Procedure Act is jurisdictional. In Citizens Committee for Hudson Valley v. Volpe, 302 F. Supp. 1083, 1091 (S.D.N.Y.1969), aff'd 425 F.2d 97 (2d Cir. 1970), the Court stated:

> "[t]he Supreme Court has implemented what appears to be a presumption in favor of a finding of jurisdiction under the Administrative Procedure Act. In Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), it was held that the courts should restrict access to judicial review 'only upon a showing of "clear and convincing evidence" of a contrary legislative intent * *.' 387 U.S. at 141, 87 S.Ct. at 1511, citing Rusk v. Cort, 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962). See also, Powelton Civic Home Own. Ass'n v. HUD, 284 F.Supp. 809 (E.D.Pa. 1968)."

No reasons have been advanced by the defendants on this aspect of the particular issue before us that would preclude jurisdiction under 5 U.S.C. §§ 702–704.

We conclude as did the Court in Citizens Committee for Hudson Valley v. Volpe:

Since the presumption in favor of jurisdiction has not been rebutted by a clear and convincing presentation of an opposite legislative intent, we hold that this court has the necessary jurisdiction to rule on the dispute under the Administrative Procedure Act.

302 F.Supp. at 1091.

### D. JURISDICTION–28 U.S.C. § 1337

Plaintiffs allege jurisdiction under 28 U.S.C. § 1337 which provides, to wit:

The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

Defendants contend that no jurisdiction exists under this Section because (1) plaintiffs have failed to satisfy the $10,-000 damages requirement and (2) the National Housing Act does not fall within "acts regulating commerce."

■■■ Defendants' first argument is erroneous because 28 U.S.C. § 1337 does not contain a $10,000 requirement. Clearly no minimum amount in controversy is required to invoke Federal jurisdiction under this section. Peyton v. Railway Express Agency, Inc., 316 U.S. 350, 62 S.Ct. 1171, 86 L.Ed. 1525 (1942); Imm v. Union Railroad Company, 289 F.2d 858 (3rd Cir. 1961).

Turning to defendants' second contention, that we are not involved with an Act regulating commerce, we note at the outset that

to found jurisdiction upon § 1337, it is not requisite that the commerce clause be the exclusive source of Federal power; it suffices that it be a significant one.

Murphy v. Colonial Federal Savings and Loan Association, 388 F.2d 609, 615 (2nd Cir. 1967). In that case, the Court held that it had jurisdiction under 28 U.S.C. § 1337 in a situation arising under the Home Loan Bank Board Act, 12 U.S.C. § 1421 et seq., which regulated Savings and Loan companies. In Imm v. Union Railroad Co., 289 F.2d 858 (3rd Cir. 1961), the Third Circuit rejected the defendants' contention that 28 U.S.C. § 1337 should be narrowly interpreted. The Court quoted with approval Professor Charles Bunn in Jurisdiction and Practice of the United States at 71–72 (1949):

"When the words were used in 1911 'acts regulating commerce' pretty clearly meant 'The Act to Regulate Commerce' * * *

"Whether this was the original meaning or not, recent cases make it clear that it is not the present one. 'Acts regulating commerce' are coming rapidly to mean all acts whose constitutional basis is the commerce clause." (footnote omitted)

289 F.2d at 860.

When Congress raised the jurisdictional amount in Federal question and diversity cases to $10,000 in 1958, it, too, inferentially approved a broad construction of 28 U.S.C. § 1337:

While this bill applies the $10,000 minimum limitation to cases involving Federal questions, its effect will be greater on diversity cases since many of the so-called Federal question cases will be exempt from its provisions. This is for the reason that Federal courts are expressly given original jurisdiction without limitation as to the amount claimed in a great many areas of Federal law. * * * When all of these types of cases are eliminated, the only significant categories of "Federal question" cases subject to the jurisdictional amount are suits under the Jones Act and suits contesting the constitutionality of State statutes. In both of these types of cases the amount claimed usually exceeds $10,000.

S.Rep.No.1830, 85th Cong. 2d Sess. 2 U.S.Code Cong. and Admin.News, pp. 3099, 3103 (1958).

Commentators have approved this broad construction of 28 U.S.C. § 1337.

See ALI Study of the Division of Jurisdiction Between State and Federal Courts 200–203 (4th tent. draft (1966); Wright, Federal Courts 92, 1963); Friedenthal, "New Limitations of Federal Jurisdiction", 11 Stan.L.Rev. 213, 218–218 (1959); Wechsler, Federal Jurisdiction and the Revision of the Judicial Code, 13 Law and Contemporary Problems 216, 225–26 (1948).

 Since the obvious purpose of the National Housing Act is to enable low income purchasers to obtain safe and adequate housing, it can certainly be considered welfare legislation and derive its Constitutional basis from the "General Welfare" Clause. See Potrero Hill Community Action Committee v. Housing Authority of City and County of San Francisco, 410 F.2d 974 (9th Cir. 1969). But the Act also was set up to insure mortgages and otherwise exert an influence on that market, which is interstate in nature. This purpose of the Act was recognized in an Opinion of the Attorney General of the United States, which examined the constitutionality and purposes of the National Housing Act. The Attorney General wrote:

It is one of the latest of a series of enactments, extending over more than a century, through which the Federal Government has recognized and fulfilled its obligation to provide a national system of financial institutions for handling the credit and exchange requirements of industry, commerce and agriculture, supplying a national currency and promoting the fiscal affairs of the Government.

38 Atty.Gen.Ops. 258, 262 (1941). As the Act does purport to touch and regulate interstate finance, its Constitutional basis also lies in the "Commerce" Clause.

 This Court also has jurisdiction under 28 U.S.C. § 1337 to determine whether declaratory and injunctive relief should be granted.

### E. MERITS OF THE CASE

 Having obviated the defendants' jurisdictional challenges, we now must determine whether the merits of the case entitle plaintiffs to declaratory and injunctive relief. Section 221(d)(2), of the National Housing Act provides that to be eligible for insurance, a mortgage must

[b]e secured by property upon which there is located a dwelling . . . meeting the requirement of all state laws or local ordinances or regulations relating to the public health or safety, zoning or otherwise, which may be applicable thereto. . . .

This provision is incorporated into § 235 by § 235(i)(2). The language of § 221(d)(2) is unmistakably clear. It is not ambiguous or subject to interpretation. The word "shall" as used in any statute does not confer discretion but rather commands, the same as if the word "must" were used in its stead. See e. g. Stanfield v. Swenson, 381 F.2d 755 (8th Cir. 1967). Both § 221(d)(2) and § 235 must be read as creating a mandatory duty upon the defendants to employ State laws and local ordinances in judging the insurability of a particular property.

The reference in § 221(d)(2) to "all . . . local ordinances or regulations relating to public health or safety" encompasses the Philadelphia Housing Code. The Philadelphia Housing Code is exactly what its title implies, a codification of local ordinances relating to housing standards in the city. The Declaration of Policy of this Code squarely places it within the ambit of those laws and ordinances referred to in § 221(d)(2):

There exists in the City numerous dwellings which are substandard in one or more features of structure, equipment, maintenance or occupancy. Such conditions adversely affect public *health and safety* and lead to the continuation and aggravation of urban blight. Adequate protection of *public health* and *safety* and welfare therefore requires the establishment and enforcement of minimum standards (Emphasis added).

Philadelphia Housing Code, § 7–102.

The defendants argue that the Secretary of Housing and Urban Development has promulgated an "exhaustive" set of uniform minimum standards of habitability which all F.H.A. appraisers are "commanded" to comply with. These standards, defendants urge, should be accepted by the Court as a reasonable substitute for state laws and local ordinances and hence should excuse them from following the Philadelphia Housing Code. Defendants further note that were they required to follow state laws and local ordinances, the administration of the 221(d)(2) and 235 Existing House Programs would be unduly burdened in two ways. First, the F.H.A. would be "compel[led]" to educate their appraisers in every locality as to the local ordinances, which would "diminish the efficacy" of the Act and "thwart the overriding intent of Congress." Second, to bring the same houses up to code would result in a cost too high for the intended buyer. In sum, defendants ask this Court to exercise our "pragmatic wisdom" and follow the "spirit of the law."

■ This Court does not exist to proclaim the spirit of the law when the letter is so abundantly clear. However wisely the Secretary may have acted in setting up his own set of rules, the fact remains that the Secretary was given no discretion at all under the Act to do so. Congress in its wisdom has mandated that defendants follow certain procedures in carrying out the 221(d)(2) and 235 Existing House Programs. If the defendants feel that they are unworkable it is incumbent upon them to go to Congress for a change in the law; this Court shall not effect that change. Until such time as Congress does change the law, the letter of the law must be obeyed. If more money is needed to finance these programs they should appeal to the conscience of the government and the nation. The defendants must insure only those mortgages which are secured by properties meeting the standards of the Philadelphia Housing Code.

■ We believe that Congress was wise to employ state laws and local ordinances as the standard rather than a set of rules promulgated by the Secretary. State laws and local ordinances are more apt to reflect the needs and requirements of a particular area of a large and diversified nation. The Secretary and his rules would be isolated from the public. Between him and the people are layer upon layer of functionaries and factotums who in their anonymity could ignore the pressure for change without fear of public scrutiny. "Protected" from the people he is supposed to serve, the Secretary could remain deaf to the cries of need and desperation. State and Local officials are at least somewhat more susceptible to public pressure because not only must they work with and live with the people for whom they are making the decisions but they are accountable to them as well through the ballot box. Furthermore, what pride is to be gained from living in a house which need not—and does not—meet the standards for other houses in the community. To this Court, to replace state laws and local ordinances with the Secretary's rules would thwart the intended purpose of the Act.

We have demonstrated above that plaintiffs have standing to bring present action before us. We need only determine whether the defendants are insuring only those mortgages secured by properties meeting the standards set by the Philadelphia Housing Code. Unquestionably they are not nor have they alleged that they have been, are, or will in the future. They do not challenge the allegations in the Complaint that they are following their own standards in determining eligibility for mortgage insurance, and, in fact, argue that they should be allowed to do so. The standards set forth in the F.H.A. Minimum Property Standards, "General Acceptability Criteria" (F.H.A. No. 300) do not conform with those contained in the Philadelphia Housing Code. It is clear from the affidavits which have been submitted to this Court by the plaintiffs and which have not been challenged or countered by the defendants that the local office of the

F.H.A. does not utilize the Philadelphia Housing Code as the standard for judging a property. Nor does it require even its appraisers to have knowledge of the code or use it in their work. Whenever repairs are made the Code is not used as the standard for whether a property becomes a proper subject for an F.H.A. insured mortgage.

■ This Court has found that mortgagees insured under § 221(d)(2) and § 235 of the National Housing Act must be secured by properties which meet these standards of the Philadelphia Housing Code. Further we have found that defendants are failing to follow this significant requirement of these two Existing House Programs. Accordingly the declaratory and injunctive relief sought by plaintiffs in their Motion for Partial Summary Judgment will be granted. Defendants shall be ordered to insure only those mortgages which are secured by properties meeting the standards of the Philadelphia Housing Code.

## II.

### DAMAGES

As we have noted, plaintiffs by their Complaint also seek compensation from the defendant United States for the financial losses and other harm they have; are; or will sustain as a result of the defendants' insuring of those mortgages which are secured by properties not complying with the Philadelphia Housing Code. Jurisdiction is alleged under 28 U.S.C. § 1346(a)(2), commonly known as the Tucker Act, which provides, to wit:

> Any other civil action or claim against the United States, not exceeding $10,-000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

This section grants the district court's concurrent jurisdiction with that of the Court of Claims under 28 U.S.C. § 1491 (2) in claims not exceeding $10,000. Defendants in their Motion to Dismiss contend that this Court does not have jurisdiction under this section.

■ Defendants argue first that under the Tucker Act only the United States may be sued and may not be joined with other defendants in a single action, citing United States v. Sherwood, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941) and Myers v. United States, 323 F.2d 580 (9th Cir. 1963). Whatever interpretation these two cases may be subject to need not concern us here, because in the case at bar only the United States is being sued for money damages under the jurisdiction of the Tucker Act. There is no case that we know of which holds or even implies that in a civil action against the United States other defendants may not be joined under other jurisdictional statutes for purposes unconnected wih the damages allegations.

■ Defendants also argue that since no privity of contract exists between them and the plaintiffs, the plaintiffs cannot obtain jurisdiction under the Tucker Act. Only a cursory reading of the Tucker Act is needed, moreover, to reveal that it covers more than merely contract claims. It also includes claims founded upon "Acts of Congress", which serves as the basis for the plaintiffs' jurisdictional claim in the case at bar.

Whereas defendants' arguments are patently frivolous, our extensive research leads us reluctantly to conclude that we have no jurisdiction to hear the damages aspect of the case at bar. Plaintiffs contend that each individual member of their class has a "claim against the United States, not exceeding $10,000 in amount, founded . . . upon . . . [an] Act of Congress . . .", specifically § 235 and § 221(d)(2) of the National Housing Act.

Plaintiffs' contention begins with the premise that statutes such as the National Housing Act bestow rights upon an intended group of persons. If these rights are wrongly denied to those whom Con-

gress intended to benefit by the legislation an implied civil remedy is created enforceable in the Courts. An express statutory grant of a remedy is not necessary. To insure that the stated purpose of an Act is to be achieved, the beneficiaries automatically receive with each right the remedy by which to enforce it. The concept of implied cause of action—that statutes enacted for the protection of a particular class from a particular harm create a cause of action in favor of the intended beneficiary class by implication—was first enunciated by the Supreme Court in Texas and Pacific Railway v. Rigsby, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916) wherein the Court created a private remedy for an employee injured by a railroad's violation of the Federal Safety Appliance Act. In doing so, the Court stated at p. 39, 36 S.Ct. at p. 484:

> [D]isregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose special benefit the statute was enacted, the right to recover the damages from the party in default is implied . . .

This doctrine has been applied by the Federal courts to other regulatory statutes. See e. g. Bivens v. Six Unknown Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); Allen v. State of Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969); J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Gomez v. Florida State Employment Service, 417 F.2d 569 (5th Cir. 1969). See also Note, "Implying Civil Remedies from Federal Regulatory Statutes," 77 Harv.L.Rev. 285 (1963).

We do not disagree with this basic premise of plaintiffs' contention. Where we do disagree with plaintiffs' contention is in its interpretation of this implied civil remedy as a "claim . . . founded . . . upon . . . [an] Act of Congress" cognizable under the Tucker Act.

The Tucker Act may be invoked "whenever a right to a sum of money is created by statute." Note, "Remedies Against the United States", 70 Harv.L.Rev. 829. Plaintiffs would have us review cases in the Court of Claims which were heard pursuant to 28 U.S.C. § 1491, and we have done so. One recent case, Eastport Steamship Corporation v. United States, 372 F.2d 1002, 178 Ct.Cl. 599 (1967), examines the language with which we are concerned and illuminates the distinction between the situation in the case at bar and the kinds of situations which are contemplated by the Tucker Act. The discussion in *Eastport* begins by noting that "it is not every claim involving or invoking the Constitution, a federal statute, or a regulation which is cognizable here." *Id.* 372 F.2d at 1007. It then continues by setting forth the two "classes" of claims which the Act covers:

> Within that sphere, the noncontractual claims we consider under Section 1491 can be divided into two somewhat overlapping classes—those in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum; and those demands in which money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury.

*Id.* at 1007. We are not concerned with the first group but we are with the second:

> . . . where no such payment has been made, the allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum. See South Puerto Rico Sugar Co. Trading Corp. v. United States, 334 F.2d 622, 626–627, 167 Ct. Cl. 236, 244–245 (1964), cert. denied, 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1965).

*Id.* at 1007. The Court goes on to consider the kinds of situations included in the group which concerns us and offers examples:

> The second category includes the varied litigations in which we are urged to hold that some specific provision of

law embodies a command to the United States to pay the plaintiff some money, upon proof of conditions which he is said to meet. Familiar examples are inverse eminent domain by a taking without formal proceedings (United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946)); a suit by a separated reserve officer for disability retired pay (Lemly v. United States, 75 F.Supp. 248, 109 Ct.Cl. 760 (1948)); an action for back pay occasioned by a wrongful dismissal from the civil service (Elchibegoff v. United States, 106 Ct.Cl. 541 (1946), cert. granted, 329 U.S. 704, 67 S.Ct. 187, 91 L.Ed. 613 (1946), cert. dismissed, 329 U.S. 694, 67 S.Ct. 629, 91 L.Ed. 607 (1947)); or a claim for compensation for flood damage authorized by statute (United States v. Gerlach Live Stock Co., 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950)). See, also, United States v. Central Eureka Mining Co., 357 U.S. 155, 162–165, 169–179, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958); Bell v. United States, 366 U.S. 393, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961).

*Id.* at 1008. Having demonstrated what kinds of situations are covered by the Tucker Act, the *Eastport* Court turns to a discussion of what is beyond the scope of the Act and offers a cogent example for clarification:

> Monetary claims which cannot be brought within these limits are beyond this court's jurisdiction, even though they may intimately involve the Constitution, an Act of Congress, or an executive regulation. . . . Where the claimaint is not suing for money improperly exacted or retained (the first class defined above, the historical boundaries of our competence have excluded those instances in which the basis of the federal claim—be it the Constitution, a statute, or a regulation—cannot be held to command, in itself and as correctly interpreted, the payment of money to the claimant, but in which some other principle of damages has to be invoked for recovery.

A federal criminal defendant, for instance, who has been invalidly convicted or deprived of his liberty because of a violation of the Constitution or an Act of Congress cannot obtain compensation under 28 U.S.C. § 1491 for his loss (although remedies may occasionally be available under the unjust conviction sections (28 U.S.C. §§ 1495, 2513) or some parts of the civil rights legislation). The provisions which void the conviction do not direct the payment of damages for the consequences of the illegality. Under Section 1491 what one must always ask is whether the constitutional clause or the legislation which the claimant cites can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained. If not, this court cannot give relief under Section 1491, although some separate general principle —arising, for example, from tort law —might lead to a remedy in another forum or under some special relief provision.

*Id.* at 1008–1009.

 The passages we have just quoted above hardly require comment. Suffice it to say that they indicate that the phrase "claim . . . founded . . . upon [an] Act of Congress" in the Tucker Act covers situations in which provisions of an Act of Congress have wrongly compelled an individual to pay money to the government or embody a right to money to which an individual by fulfulling certain requirements can lay claim. Beyond its scope are situations which are related to an Act of Congress or involve an Act of Congress as an essential element but which require intervening circumstances of legal significance to give an individual a right to an action for damages.

 The §§ 235 and 221(d)(2) Existing House Programs do not directly or impliedly create a right to a sum of money. These sections do not authorize or "command" that money be granted to the plaintiffs; they confer upon the

**48**

plaintiffs the right to obtain decent housing. Plaintiffs' complaint is not a "claim" to money based upon rights granted by the provisions of §§ 235 and 221(d)(2) but is an action for damages based upon their failure to realize their right to decent housing due to the defendants' disregard for the wording of these sections. The right to a remedy in monetary damages for violation of an Act of Congress is not the same as a direct right to money conferred by the act itself. When damages are sought as here, the cause of action or "claim" does not arise from the provisions of an Act of Congress but from the wrongful manner in which the act was implemented. Our research has not disclosed nor have there been presented to us any cases which support or even suggest that an implied cause of action can find its jurisdictional basis in the Tucker Act. All the cases we have found in our extensive research conform to the reading and application of the Tucker Act given by the Court in the *Eastport Steamship Corporation* decision. Thus it cannot be said that plaintiffs' "claim" is "founded . . upon . . . [an] Act of Congress." Plaintiffs' jurisdictional allegation based on 28 U.S.C. § 1346(a)(2) must fall and defendants' Motion to Dismiss must be granted.

This Court cannot conclude without making certain observations. We have great sympathy for the plight of the plaintiffs and our decision on this aspect of the case is doubly hard since the well being of people is being sacrificed for the sake of legal principals, which, important as they are, neither eat nor sleep, hurt nor feel cold.

Our decision will certainly be appealed. As a District Court we felt constrained by prior decisions, especially those of the Court of Claims. Plaintiffs' counsel are to be commended for their sensitivity to the plight of the plaintiffs and their efforts in their behalf. It is to be hoped that the defendants will find a means to assuage the hardships borne by the plaintiffs. Perhaps Congress will act more forcefully to correct the wrongs done to the plaintiffs. Or perhaps the Circuit Court will not feel the constraints we have felt.

### ORDER

And now, to wit, this 13th day of February, 1973, it is hereby ordered that defendants' Motion to Dismiss plaintiffs' prayer for declaratory and injunctive relief in the above captioned action is denied:

It is further ordered that plaintiffs' Motion for Partial Summary Judgment on its prayer for declaratory and injunctive relief is granted:

It is further ordered that defendants insure only those mortgages issued under § 235, 12 U.S.C. § 1715z(i)(2), and § 221(d)(2), 12 U.S.C. § 1715*l*(d)(2), the National Housing Act, 12 U.S.C. § 1701 et seq., which are secured by properties which comply with the Philadelphia Housing Code; and

It is finally ordered that defendants' Motion to Dismiss plaintiffs' prayer for damages in the above captioned civil action is granted.