Eva Mae ROBERTS, on behalf of herself and all others similarly situated, Plaintiffs,

v.

CAMERON BROWN COMPANY and Federal National Mortgage Association, Defendants.

Civ. A. No. 174–62.

United States District Court, S. D. Georgia, Augusta Division.

July 29, 1975.

William J. Cobb, Georgia Indigents Legal Services, Augusta, Ga., David F. Walbert, John L. Cromartie, Jr., Georgia Indigents Legal Services, Atlanta, Ga., for plaintiff.

Keith W. Benning, Augusta, Ga., for Cameron-Brown Co.

Regnald Maxwell, Augusta, Ga., Charles E. Watkins, Jr., G. Lee Garrett, Jr., Atlanta, Ga., for Federal Nat. Mortg. Assn.

## ORDER

ALAIMO, District Judge.

Plaintiff mortgagor has brought this action against Federal National Mortgage Association, mortgagee, and its mortgaging servicing agent seeking both an injunction to prevent non-judicial foreclosure of her mortgage and a declaratory judgment holding that HUD Handbook 4191.1 imposes legally enforceable duties on Section 235 mortgagees and servicers.

Plaintiff now moves for a determination that the action be maintained as a class action pursuant to Rule 23(c)(1), Fed.R. Civ.P. That rule states:

"As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits."

Plaintiff seeks to represent "a class consisting of all present and future mortgagors whose mortgages are held or serviced by defendants, if such mortgage is secured by a single-family dwelling located in the State of Georgia and the mortgage was executed in conjunction with the extension of financial assistance under Section 235 of the National Housing Act, 12 U.S.C. § 1715z." *Plaintiff's Motion for Determination of Class.*

In order to make a determination that an action may be maintained as a class action, the court must find that the requisites of Rule 23(a) are met and in addition, that the provisions of one of three subdivisions of Rule 23(b) are satisfied. Rule 23(a) requires a determination that (1) the class in question "is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims

or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

█ In the present case, there is no question that the class plaintiff seeks to represent is sufficiently numerous to satisfy the requirements of Rule 23(a)(1). However, defendant FNMA asserts that the claims of Ms. Roberts are not typical of the class of Section 235 mortgagors and that they do not present common questions of fact or law.[1] In support of this position, FNMA states that no other mortgagor will be in precisely the same personal situation as Ms. Roberts and consequently, the actions taken by the defendants with respect to Ms. Roberts and other Section 235 mortgagors will differ in major respects. Plaintiff, on the other hand, points out that Rule 23(a) "does not require identity as to all issues, but merely commonality as to some question of law or fact." *Plaintiff's Memorandum in Support of Motion for Determination of Class*, p. 3.

█ Upon consideration of the parties' pleadings, it appears that common legal issues raised by the plaintiff's complaint predominate over individual fact questions, and that Ms. Roberts' claims are typical of the class as a whole. As the plaintiff points out, all mortgages executed under the Section 235 program contain power of sale clauses. The adequacy of the procedure for foreclosure which this type of clause contemplates raises an issue of law that is the same for each and every member of the class. With respect to Ms. Roberts' second claim relating to the applicability of various provisions of HUD Handbook 4191.1, The Administration of Insured Home Mortgages, many common issues are presented even if no mortgagor claims identical violations of the Handbook. For example, questions such as whether a private civil remedy ex-

ists under Section 235 and whether the Handbook is legally binding on mortgagees are the same for the entire class. *See* 7 Wright & Miller, Federal Practice and Procedure § 1763, pp. 603–10; *Huff v. N.D. Cass Co.*, 485 F.2d 710 (5th Cir. 1973), *en banc*; *Escalera v. New York City Housing Authority*, 425 F.2d 853, 867 (2d Cir.), *cert. denied*, 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970); *Norwalk CORE v. Norwalk Redevelopment Agency*, 395 F.2d 920, 937 (2d Cir. 1968); *Rodriguez v. Swank*, 318 F.Supp. 289, 294 (N.D.Ill.1970), *aff'd*, 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677 (1971). Consequently, Ms. Roberts' class action allegations meet the requirements of 23(a)(2) and (a)(3).

█ In addition, it appears to this Court that Ms. Roberts satisfies the "adequate representative" requirement under Rule 23(a)(4). Defendant maintains that Ms. Roberts' failure to comply with an order of the Court directing her to pay "the sum of $79.79 on the 15th day of each month beginning on July 15, 1974," (Order dated June 26, 1974) renders her an inadequate representative of the class. However, this position either misperceives the purpose for the "adequate representative" requirement or overemphasizes the importance of the individual merits of the representative plaintiff's claim. As the Court of Appeals for the Fifth Circuit stated in *Gonzales v. Cassidy*, 474 F.2d 67, 72 (5th Cir. 1973), two factors are critical in determining whether an individual is an adequate representative:

"(1) [T]he representative must have common interests with the unnamed members of the class; and (2) it must appear that the representative will vigorously prosecute the interests of the class *through qualified counsel.*" *Id.* at 72. (Emphasis supplied).

1. Defendant FNMA also contends that this Court should adopt the rationale of *Geehring v. Municipal Court of Girard*, 357 F.Supp. 79, 82–83 (N.D.Ohio, 1973), which it claims stands for the proposition that indigent plaintiffs cannot represent non-indigent persons in a class action. However, in *Geehring*, the district court merely held that a non-indigent plaintiff and an

indigent plaintiff who had counsel appointed for her could not represent the class of indigent plaintiffs who were denied counsel in similar cases. Furthermore, research reveals no authority supporting FNMA's view, and this Court cannot determine any valid reason for denying plaintiff's class action claims on this ground.

*Accord Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 562–63 (2d Cir. 1968), *rev'd on other grds.,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Shulman v. Ritzenberg,* 47 F.R.D. 202 (D.D.C.1969). The Court has already determined that Ms. Roberts has interests in common with the class as a whole. Moreover, defendants do not contend that plaintiff's attorneys are not qualified to conduct this action, and they have clearly demonstrated to this Court both the skill and dedication necessary to competently protect the interests of the class. The fact that Ms. Roberts has tendered only half the required amount to the Court bears heavily on her claim under the HUD Handbook,[2] but it does not establish that she lacks interest in the resolution of the case. Certainly, her economic stake in the outcome of the action suggests that she will "vigorously prosecute and defend" her own claims and those of other Section 235 mortgagors. 3B Moore, Federal Practice ¶ 23.-07(2), p. 23–371; *Rodriguez v. Swank, supra.* More importantly, the course of this lawsuit, from the time the initial pleadings were filed until the present time, clearly demonstrates an aggressiveness on the part of Ms. Roberts and her attorneys which belies any suggestion that the other class members will not be adequately protected. Since this is the purpose for the "adequate representative" requirement in Rule 23(a)(4), it would be improper for this Court to refuse certification on the ground that this requirement has not been satisfied.

Thus, all the pre-requisites for a class action under Rule 23(a) are present in this case. The only remaining question for the Court to consider is whether the class should be certified under Rule 23(b)(1), (b)(2), or (b)(3). Plaintiff alleges that either 23(b)(1), or (b)(2) is applicable in this case, and consequently, no notice to the class members is required, nor are they permitted to opt out of the class. Rule 23(c)(2); 3B Moore, Federal Practice ¶ 23.-55. More specifically, plaintiff contends that "defendants act on exactly the same basis with regard to all members of the class," thus bringing the action within the scope of Rule 23(b)(2) and that "varying adjudications and actions by different mortgagors would leave defendants unable to determine the proper course of their own conduct," and "any one judicial decision would have the effect of *stare decisis,*" making 23(b)(1)(A) and (B) applicable. *Plaintiff's Memorandum in Support of Motion for Determination of the Class,* p. 3.

Whatever the merits of plaintiff's contentions with respect to 23(b)(1)(A) and (B),[3] this Court finds that Ms. Roberts' class action can be properly maintained under Rule 23(b)(2).[4] That section states:

"An action may be maintained as a Class action if the pre-requisites of subdivision (a) are satisfied, and in addition:

---

2. The Supreme Court in *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) held that a court has no power under Rule 23 "to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action. Indeed, such a procedure contravenes the Rule by allowing a representative plaintiff to secure the benefits of a class action without first satisfying the requirements for it." *Id.* at 177, 94 S.Ct. at 2152. *See also Miller v. Mackey International,* 452 F.2d 424, 427 (5th Cir. 1971). Consequently, it would be improper for this Court to consider whether Ms. Roberts' complaint states an adequate ground for recovery under the Handbook, assuming it is legally binding on mortgagees and servicers participating in the Section 235 program.

3. Since actions brought under Rules 23(b)(1) and (b)(2) are treated identically for purposes of notice to passive class members and in "measuring the effect of the judgment," a court need only determine that one of these provisions applies and is not required to choose between them. 7A Wright & Miller, Federal Practice and Procedure § 1772, pp. 7–8.

4. Plaintiff's action is probably also maintainable as a class action under Rule 23(b)(3) in that questions of law predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. However, when there is a choice between a (b)(2) and (b)(3) class action, the court should order that the suit be maintained as a class action under (b)(2). 3B Moore Federal Practice ¶ 23.31, pp. 23–526 to –527.

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; . . ."

What is necessary for (b)(2) to apply is conduct by the defendant that is generally applicable to the entire class whether or not all class members are aggrieved by such conduct or desire relief. *See* Advisory Committee's Note to the 1966 Amendment to Rule 23; *Norwalk CORE v. Norwalk Redevelopment Agency*, 395 F.2d 920 (2d Cir. 1968). A second pre-requisite is that final injunctive or declaratory relief must be requested against the party opposing the class. 7A Wright & Miller, Federal Practice and Procedure § 1775, p. 21. However, there is no requirement that there be an exact identity of all issues among class members, and courts have "the duty, and ample powers, both in the conduct of the trial and relief granted to treat common things in common and to distinguish the distinguishable." *Jenkins v. United Gas Corp.*, 400 F.2d 28, 35 (5th Cir. 1968).

In the present case, plaintiff seeks a permanent injunction to restrain the defendants from violating the servicing procedures outlined in HUD Handbook 4191.1 and from using power of sale clauses in Section 235 mortgages executed in Georgia. In addition, she prays for declaratory relief in the form of a judgment declaring foreclosure of Section 235 mortgages unconsti-

tutional when executed pursuant to the non-judicial procedure of Ga.Code Ann. §§ 67-1506, 39-1101, 39-1102, and 39-1201. Defendants have acted in a manner generally applicable to the class through their use of power of sale provisions in all Section 235 mortgages, and their pursuit of similar servicing techniques with respect to every mortgagor in the Section 235 program. Even if mortgagees raise different issues with respect to the HUD Handbook, as FNMA contends, the Court has the authority to determine whether the Handbook is legally binding on mortgagees, whether individual mortgagors have a right to sue for alleged violations of it, and whether the defendants' servicing techniques violate its provisions.[5]

Therefore, this Court finds that plaintiff is entitled to represent the class of all present and future Section 235 mortgagors whose mortgages are held or serviced by the defendants and are secured by a single-family dwelling located in the State of Georgia. Accordingly, plaintiff's class is hereby certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, as follows:

"A class consisting of all present and future mortgagors whose mortgages are held by FNMA or serviced by Cameron-Brown, if such mortgage is secured by a single-family dwelling located in the State of Georgia and the mortgage was executed in conjunction with the extension of financial assistance under Section 235 of the National Housing Act, 12

---

**5.** Defendant FNMA contends that even if the requirements of Rule 23 are satisfied, many of the Section 235 homeowners may not possess sufficient equity in their homes to satisfy the jurisdictional requirements under 28 U.S.C. § 1331, which FNMA argues applies in this case since there is no state action and consequently, jurisdiction cannot rest on 42 U.S.C. § 1983 and 28 U.S.C. § 1343. Furthermore, FNMA correctly points out that the claims of individual mortgagors in the Section 235 program cannot be aggregated under the rationale of *Zahn v. International Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973) and *Snyder v. Harris*, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), because such claims are severable and distinct. *See Alvarez v. Pan*

*American Life Insurance Co.*, 375 F.2d 992, 994–95 (5th Cir. 1967); *Sigel v. General Development Corp.*, 59 F.R.D. 577, 581–82 (M.D.Fla. 1973); 3B MOORE, FEDERAL PRACTICE ¶ 23.08, pp. 23–2505 to 2515; *cf. People's Rights Organization v. Bethlehem Associates*, 356 F.Supp. 407, 410 (E.D.Pa.1973). Thus, FNMA concludes that since the value of each mortgagor's interest should be measured by the amount of equity in his home, plaintiff Roberts cannot represent what is probably the vast majority of Section 235 homeowners. However, in every instance the promissory note evidencing the loan upon which the mortgage or security deed is based is well in excess of $10,000, thus satisfying the jurisdictional requirement of 28 U.S.C. § 1331.

U.S.C. § 1715z, and is currently insured thereunder."

The parties shall, within fifteen (15) days hereof, submit to the Court any form of notice which they contend must or should be given.

## ORDER

This case initially arose as a result of alleged violations by the defendants of the due process clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States and of the Department of Housing and Urban Development (HUD) Handbook 4191.1, *Administration of Insured Home Mortgages,* promulgated pursuant to the National Housing Act, 12 U.S.C. § 1715z. By Order dated February 4, 1975, this Court determined that defendants' use of power of sale provisions in mortgages issued under the National Housing Act violates the due process clause of the Fifth Amendment, but that HUD Handbook 4191.1 creates no personal rights on behalf of individual mortgagees to sue for failure to comply with its provisions. The case is now before the Court on plaintiffs' motion to reconsider its previous Order as it relates to the Handbook issue and for partial summary judgment, and on defendants' motion to dismiss the constitutional issue on the grounds that it is now moot since defendants are willing to foreclose judicially on Ms. Roberts' property.

The relevant facts giving rise to this action are not disputed. In October, 1972, plaintiff, Eva Mae Roberts, purchased a home in the Barton Village Subdivision located in Richmond County, Georgia. This home was financed by a mortgage subsidized and regulated under Section 235 of the Housing and Urban Development Act of 1968, 12 U.S.C. § 1715z. As in the case of many other mortgages purchased under the Section 235 program, defendant, Federal National Mortgage Association (FNMA), a federal corporation organized pursuant to

12 U.S.C. § 1716 *et seq.,* is the holder of the mortgage on the property. Defendant, Cameron-Brown Company, a North Carolina corporation doing business in Georgia, is currently servicing the mortgage.

A brief explanation of the Section 235 subsidy program is essential for a proper understanding of this case. The purpose of the program is to provide "a decent home and a suitable living environment for every American family". 12 U.S.C. § 1701t. In order to bring homeownership to low income families, the program reduces the cost of financing a home by providing mortgage insurance and by making mortgage assistance payments to the mortgagee on behalf of the mortgagor. These payments limit the costs of the mortgage to the equivalent costs of a mortgage bearing interest at a rate of one percent. 12 U.S.C. §§ 1715z(c)(2) and 1715z(i).

Only persons having insufficient funds or inadequate credit to finance homes conventionally are permitted to participate as mortgagors in the program. 12 U.S.C. § 1715z(b)(2). Additionally, only mortgagees approved and supervised by the Department of Housing and Urban Development (HUD), which is charged with administering the Section 235 program, are entitled to receive mortgage assistance payments and mortgage insurance. *See* 24 C.F.R. §§ 203.1 to 203.9, *as incorporated in Section 235 by* 24 C.F.R. § 235.1(a). In all aspects of the mortgage transaction, both mortgagors and mortgagees must submit to extensive regulation and supervision by HUD. Relevant in this particular case are the rules and regulations specifically relating to mortgagor defaults and foreclosures. These provisions will subsequently be examined in more detail in this Order.

In May, 1974, defendant, Cameron-Brown, instituted foreclosure proceedings against plaintiff Roberts' property utilizing Ga.Code Ann. § 67–1506,[1] which permits a creditor to avoid judicial foreclosure by us-

---

1. Ga.Code Ann. § 67–1506 provides: "No sale of real estate under powers [of sale] contained in mortgages, debt, deeds, or other lien contracts shall be valid unless the sale shall be advertised and conducted at the time and place and in the usual manner of sheriff's sales in the county in which real estate, or a part thereof is located."

ing a power of sale provision in a security deed. Although this procedure has already been determined to be unconstitutional,[2] plaintiff also challenges Cameron-Brown's *decision* to foreclose, arguing that it violates certain regulations relating to mortgagor defaults and forebearance relief, 24 C.F.R. §§ 203.330 to 203.342, and more particularly, HUD Handbook 4191.1. Defendants, on the other hand, contend first, that these regulations are only enforceable by HUD against mortgagees and create no private cause of action on behalf of individual aggrieved mortgagors; and second, with respect to HUD Handbook 4191.1, that the provisions relating to the treatment of defaults are merely advisory and do not have the force and effect of law.

In order for plaintiffs to assert a cause of action under the Handbook, it appears to this Court that four elements must be established: first, that implying a civil remedy would further the goals of the National Housing Act and would not be merely superfluous to presently existing methods by which individual mortgagors can obtain relief; second, that plaintiffs have standing to sue defendants for violating the provisions of the Handbook; third, that the sections relied on by plaintiffs are mandatory and not simply precatory; and fourth, that the provisions of the Handbook are enforceable against mortgagees participating in the Section 235 program.[3]

One of the bases of this Court's previous Order was its determination that implication of a private remedy under the National Housing Act could frustrate administrative enforcement of the Act. Order Dated February 4, 1975, p. 7. Since the date of that Order however, it has come to the Court's attention that HUD has largely failed in its obligation to ensure compliance with the Act's objectives. The opinion of the Circuit Court of Cook County, Illinois, in *Federal*

*National Mortgage Association v. Huffman,* No. 73–CH–7453 (April 17, 1975), is instructive:

"Once HUD initiates the lending program its assistance to mortgagors comes to a sudden stop. If, after having obtained a mortgage, a mortgagor finds it impossible to make payments because of illness, sudden unemployment or other difficulties, HUD demonstrates no effort to help the mortgagor or to force HUD's mortgagees to help, despite the GUIDE (the Agency's publication preceding the Handbook) which provides comprehensive measures to be used when a mortgagor is in default because of circumstances beyond his control. Instead, HUD requires the mortgagee to follow the practices of a 'prudent lending institution' (24 C.F.R. § 203.9), which the mortgagee interprets as obliging it to refer the matter as quickly as possible to its attorneys so that collection procedures can be instituted. The irony and inconsistency in the 'prudent lending' practice is that a 'prudent lending institution' would not have lent money to these mortgagors in the first place because of their marginal financial status. Once the referral to the attorneys occurs, it becomes difficult, if not impossible, for the struggling mortgagor to reinstate . . . ."

"Thus, we find HUD and its servicing mortgagees in a tragic charade with the mortgagors. HUD helps to obtain a mortgage for one who would not otherwise qualify and promises that person a chance to share in the American dream of a decent home for his family, but at the first sign of any problem, HUD abandons the mortgagor, who by definition does not have either a high or stable income, to the regular foreclosure procedures established for the traditional mortgagor-mortgagee relationship. The mortgagee

---

**2.** *See* text, p. 1, *infra.*

**3.** In its previous Order, the Court determined that there was no need to imply private remedies under the Act since some enforcement powers were given to HUD and judicial interference in the administration of the Section 235 program might be disruptive. *See* Order Dated

February 4, 1975, pp. 3–8. In addition, the Court held that HUD Handbook provisions and published regulations appear "designed to aid mortgagees in the exercise of their authority under Section 235 rather than to impose legal requirements." *Id.* at 10.

has much to gain by a quick foreclosure. The mortgage is insured by a creature of the federal government and the sooner the mortgage is foreclosed, the sooner the mortgagee gets its money which may be reinvested at a greater rate of return." *Id.* at 9–10.

The result of HUD's abdication of responsibility has been to make it "the largest owner of abandoned dwellings in our urban communities." *Brown, et al. v. Lynn, et al.,* 385 F.Supp. 986 (N.D.Ill.1974). As Judge Will observed in *Brown v. Lynn, supra,*

"By HUD's own admission, as of April 30, 1974, it possessed approximately 78,000 foreclosed single family dwellings. In Chicago alone, HUD has in excess of 2,200 vacant homes and defendant Waner anticipates about 5,000 more in the coming months. . . . The impact upon the urban community is substantial, not only in terms of the displaced and traumatized families, but also because of the lost housing, increased fire hazard, vandalism and blight." *Id.* at 999.

Similarly, Judge Garrity noted in *Farragher v. Dorchester Savings Bank,* Housing Court of the City of Boston, Civil Action No. 0/2/5/9/7 (December 27, 1974), that in the Dorchester District alone there were "hundreds or perhaps thousands of abandoned multi-family residential dwellings" under the Section 203 mortgage program, which is similar to the Section 235 program and is also administered by HUD. *Id.* at 6–7.

The conclusions of these courts are consistent with the findings of a study, "Causes of Defaults and Foreclosures in the FHA Single-Family Mortgage," commissioned by HUD and conducted by Eugene F. Toton at the Law Center of the University of Southern California. The purpose of the study was to analyze the causes of defaults and foreclosures in three of the single-family housing mortgage insurance programs administered by HUD and FHA, including the Section 235 program. The investigation disclosed that mortgagees participating in the program generally disregarded administrative regulations, mortgagors received little or no assistance in trying to cure defaults, and mortgagees treated low income mortgagors in the same manner as conventional mortgagors, utilizing no special procedures such as forbearance relief. Affidavit of Eugene F. Toton, Project Director of "Causes of Defaults and Foreclosures in the FHA Single-Family Mortgage Insurance Programs," pp. 2–3. The causes of these abuses were found in major part to be HUD's inadequate investigative techniques for uncovering abuses and its failure or refusal to impose sanctions on violating mortgagees. *Id.* at 5–7. The result has been a complete disregard for the procedural standards established for mortgagees and servicers participating in these programs.

The experience in Georgia parallels the findings of the Toton study. Although there are approximately 120,000 single-family insured loans in Georgia, HUD's regional office consists of a chief officer and four assistants. Deposition of Macie Helton and William Beasley, Conducted at 9:30 A.M., May 23, 1975, pp. 46, 48. The problems which this shortage of personnel places on administration of the National Housing Act in Georgia have been described by one of the regional employees as follows:

"[W]e don't have the personnel to review every case that we've got. We've got approximately 120,000 single family homes in the State of Georgia, and we've got 4 people that are doing it, and HUD just does not have the personnel to completely review and instigate investigations . . . on each particular case that may come up." *Id.*

Regulation of servicing practices is also inhibited by the fact that state offices cannot review out-of-state servicing companies unless they have offices in the State of Georgia, even if the area office receives a complaint from an in-state mortgagor. *Id.* at 44. As a result, even egregious servicing practices on the part of 235 mortgagees and servicers must frequently go unremedied.

In addition, the procedures by which HUD obtains information relating to servicing practices are not calculated to lead to the discovery of Handbook violations. HUD form 2068, which indicates nothing

about why foreclosure is necessary or what servicing procedures have been followed in an individual case, is the only information HUD is assured of receiving before foreclosure proceedings are instituted. *See* Plaintiffs' Exhibit 2, Deposition of Macie Helton and William Beasley, Conducted at 9:30 A.M., May 17, 1975, pp. 4–5. The only additional information about servicing HUD ever receives comes through limited questionnaires sent to servicers and brief visits to servicers' offices. *Id.,* Conducted at 1:30 P.M., May 23, 1975, pp. 17–18. As plaintiffs point out, this is an "inherently limited procedure since only one side of the story is heard." Plaintiffs' Summary of Deposition of HUD Employees, p. 5.

On the basis of this information, the Court must conclude that its previous reluctance to interfere with the administrative enforcement of the National Housing Act is unwarranted. In fact, it seems that the only means of effectuating the objectives of the Act is to imply civil remedies for individual aggrieved mortgagors. Such supplemental civil relief would certainly increase the likelihood of compliance with the Act since under the present system violators have no reason to conform their conduct to it. Moreover, implying civil remedies would provide direct relief which is not presently available to those whom the Legislature wished to protect. *See Saine v. Hospital Authority of Hall County,* 502 F.2d 1033, 1034–35 (5th Cir. 1974).

The adequacy of remedies for infringement of statutorily conferred rights has always been a critical factor in determining whether to imply civil remedies. *See* Note, *Implying Civil Remedies from Federal Regulatory Statutes,* 77 Harv.L.Rev. 285 (1963). *Compare Jeter v. St. Regis Paper Co.,* 507 F.2d 973 (5th Cir. 1975); *Breitwieser v. KMS Industries, Inc.,* 467 F.2d 1391 (5th Cir. 1972), *with Gomez v. Florida State Employment Service,* 417 F.2d 569 (5th Cir. 1969). For example, the Court of Appeals for the Fifth Circuit stated in *Breitwieser v. KMS Industries, Inc., supra,*

"Although federal courts have on occasion implied remedies for infringement of federally conferred rights, . . . they have done so only when the law creating the right provided for no remedy or for a grossly inadequate remedy. The courts have thus implied relief when necessary to prevent abrogation of congressional policies." 467 F.2d at 1392.

Thus, in both *Breitwieser v. KMS Industries, Inc., supra,* and *Jeter v. St. Regis Paper Co., supra,* the Court refused to imply civil remedies because the enforcement mechanisms of the Acts involved in those cases were adequate to ensure compliance and protection for the intended beneficiaries of the Acts. On the other hand, in *Gomez v. Florida State Employment Service, supra,* the same Court implied a remedy for migratory farm laborers under the Wagner-Peyser Act, 29 U.S.C. §§ 29 *et seq.,* emphasizing that absent such a remedy, the workers would not have the protection of a civil, or even a criminal, sanction against violators. 417 F.2d 576.

Under the National Housing Act and its regulations, the only sanction for violations either by mortgagees or servicers is HUD's withdrawal of its approval to participating mortgagees. 24 C.F.R. § 203.9, *incorporated by* 24 C.F.R. § 235.1. Direct action against a non-complying servicer is apparently not even within HUD's jurisdiction. Consequently, abuses of the Act relative to servicing procedures are remediable only by holding the mortgagee responsible for improper servicing and refusing to allow it to participate in the Section 235 program. When a mortgagee the size of FNMA, which must use many different servicing agents, is involved, it is realistically impossible for HUD to remedy servicing abuses in individual cases, even assuming that it were properly enforcing the Act. Moreover, the disapproval remedy is prospective only, and affords no relief to mortgagors who have been subjected to poor servicing.

In light of these circumstances, the only logical inference is that absent an implied cause of action, plaintiffs will be left without any means of redressing violations of the Act which deprive them of their

homes and defeat the purposes of the Act. For this reason, and because according civil relief to individual mortgagors is the only practical means available for enforcing compliance with the act and its regulations, this Court finds that it would be entirely consistent with Congressional objectives in establishing the Section 235 program to imply civil remedies for individual aggrieved mortgagors.[4]

■■■■ The second element which plaintiffs must establish to assert a cause of action under the Handbook—standing to sue for improper servicing practices—is clearly present in this case. Standing depends on the presence of two factors. First, " . . . the plaintiff must allege that he has suffered a wrong, economic or otherwise, which will give him 'some personal stake in the outcome of the litigation.'" *Davis v. Romney,* 355 F.Supp. 29, 35 (E.D.Pa.1973), *aff'd in relevant part,* 490 F.2d 1360 (3d Cir. 1973), *quoting Norwalk CORE v. Norwalk Redevelopment Authority,* 395 F.2d 920, 927 (1st Cir. 1968). Second, he must demonstrate that the interest he seeks to protect "is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Services Organization, Inc., et al. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *see Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Gomez v. Florida State Employment Service,* 417 F.2d 569 (5th Cir. 1969).

The purpose of requiring a "personal stake in the outcome of the litigation" is to insure that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." *Id.* at 151–52. This reflects the requirement in Article III of the federal Constitution that the exercise of judicial power be limited to "cases and controversies." *Flast v. Cohen,* 392 U.S. 83, 109, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). In the present case, plaintiffs have alleged sufficient injury in fact to demonstrate a personal stake in the outcome of the case. The Handbook clearly recognizes that in order to implement the Section 235 program and carry out the express Congressional goal of providing decent housing to low income families, mortgagees must give special assistance to participating mortgagors not generally accorded in conventional mortgage situations. Failure to do so could only result in frequent defaults and foreclosures, thus undermining the purposes of the program. Therefore, defendants' alleged failure to follow the servicing standards established in the Handbook directly relates to plaintiffs' ability to remain homeowners. Mortgagors who are faced with loss of their homes as the result of improper servicing techniques certainly demonstrate an injury satisfying the requirements of Article III. *See Davis v. Romney, supra,* at 36.

With respect to whether plaintiffs are within the "zone of interests to be protected," it is sufficient to quote from the National Housing Act itself:

"The Congress affirms the national goal, as set forth in Section 1441 of Title 42, of 'decent home and a suitable living environment for every American family'.

"The Congress finds that this goal has not been fully realized for many of the Nation's lower income families; that this

---

**4.** In an *amicus curiae* brief, the Mortgage Bankers Association of Georgia argues that implying a private cause of action under the National Housing Act would discourage private investment in insured home mortgages because "[no] mortgage company wants to risk the possibility of expensive federal court action every time it finances a HUD insured home mortgage." *Amicus Curiae* Brief, p. 7. However, plaintiffs in this case seek only a declaratory judgment that HUD Handbook 4191.1 is binding on mortgagees so that when foreclosure proceedings are initiated, mortgagors can defend on the basis of noncompliance with the Handbook. Thus, "expensive federal court action" is not threatened every time a mortgage company finances a HUD insured home mortgage. Rather, a holding by this Court that mortgagors can sue under the Handbook would only have the effect of preventing mortgagees from undertaking foreclosure without first considering HUD regulations.

is a matter of grave national concern; . . . ."

"The Congress declares that in the administration of those housing programs authorized by this Act which are designed to assist families with incomes so low that they could not otherwise decently house themselves . . . *the highest priority and emphasis should be given to meeting the housing needs of those families for which the national housing goal has not become a reality. . . .*" 12 U.S.C. § 1701t (1968). (Emphasis supplied).

It is clear from this statement of purpose that Congress intended to include low income mortgagors, like plaintiffs, among the beneficiaries of the National Housing Act. Consequently, their interest in maintaining their homes is within the zone of interests sought to be protected by the Act. *See generally, Brown v. Lynn,* 385 F.Supp. 986 (N.D.Ill.1974); *Davis v. Romney, supra,* at 36–38.

Having determined that implying civil remedies would be consistent with the objectives of the National Housing Act, and that plaintiffs have standing to assert a cause of action under the Act, it is necessary to consider whether the provisions of the Handbook on which plaintiffs rely in bringing this action are mandatory or simply precatory in nature. Defendants contend that the Handbook was merely intended to explain certain policy guidelines which the Secretary of HUD considered relevant in dealing with Section 235 mortgagors, and was never meant to impose mandatory servicing obligations on mortgagees. In support of this position, defendants submit an affidavit of Mr. Fred Pfaender, Director of Loan Management for HUD, who avers that its foreclosure and servicing provisions were designed to be advisory only. Additionally, defendants cite the language of the Handbook itself as further evidence that servicing techniques were meant to remain discretionary with the mortgagee, concluding that imposing duties on mortgagees based on the Handbook would defeat HUD's purposes in creating a flexible servicing program.

Certainly, this Court agrees with defendants that HUD Handbook 4191.1 was intended to provide flexible guidelines for handling mortgages under the 235 program. However, despite some discretion given the mortgagee in servicing individual accounts, language contained in the Handbook relating to its purposes and effect is definitely directive in nature. For example, in Section 1 of Chapter 1, the Handbook flatly states:

"It is to be noted that the Handbook sets forth, in considerable detail, procedural standards *to be observed* by those servicing HUD insured mortgages. In order to determine whether the management objectives of this Handbook are being achieved, the Central and Field Offices of HUD will monitor servicing operations. Mortgagees with poor servicing practices *will be identified and the failure of any mortgagee to satisfactorily correct any servicing deficiencies in HUD-insured mortgages in accordance with the provisions of this Handbook, may result in suspension or termination of the lender's acceptability as a HUD-approved mortgagee.*" HUD Handbook 4191.1, Chapter 1, § 1, p. 1 (Emphasis supplied).

Defendants have not explained, nor can this Court determine, why, if the Handbook was intended to be advisory only, HUD indicated in its first paragraph that non-compliance might result in withdrawal of approval for participation in the Section 235 program. Moreover, there are additional provisions specifically relating to foreclosure and forbearance relief in the Handbook which are couched in language inconsistent with defendants' assertion that mortgagees could follow or not follow the Handbook as they wished:

"Mortgagees are expected to make a concerted effort to avoid foreclosure or assignment of HUD insured mortgages, and to utilize acceptable methods of forbearance relief, wherever feasible. Forbearance is available in several forms where it is reasonable for the mortgagee to believe that the mortgagor can and will resume the mortgage payments. Any of the relief measures discussed in

this Chapter may be used and mortgagees *are expected to refrain from foreclosure where it is determined that the case may be salvaged through the use of one or more of these procedures."* *Id.* at Chapter 8, § 121m p. 47 (Emphasis supplied).

"When the mortgagor either cannot or will not resume and complete the mortgage payments, the mortgagee shall take steps to acquire the property. In cases where the default is caused by a hardship beyond the mortgagor's control, *this decision shall be made only after all of the relief measures described in Chapter 8 have been considered, and the mortgagee has determined that none of them is likely to be effective in making it possible for the mortgagor to retain the property."* *Id.* at Chapter 9, § 141, p. 55 (Emphasis supplied).

*"Foreclosure is a last resort and shall not be initiated until all other servicing actions have been exhausted . . . .* The mortgagee is responsible for conveying good merchantable title to the property and for furnishing satisfactory title evidence when the property is conveyed to the Secretary, and the method of foreclosure is a concomitant to meeting this responsibility. Foreclosures shall be completed in accordance with local statutes and prevailing practices in the area in which the property is located." *Id.* at Chapter 9, § 144, p. 57 (Emphasis supplied).

The language of these representative sections demonstrates that the Handbook contains at least some mandatory requirements, as well as advisory guidelines. As plaintiffs point out, the Handbook's use of language which apparently accords servicers a certain amount of discretion in some provisions merely reflects that the determination of whether to follow a certain section must often depend on the particular circumstances of the case, and not that the servicer is free to ignore the Handbook at his whim.

This conclusion is further supported by the deposition of two HUD employees—Mr. William Beasley, Chief, Loan Management Branch, and Ms. Macie Helton, Loan Specialist for HUD's regional office. In response to a question from plaintiffs' counsel as to whether mortgagees are required to follow the Handbook, Mr. Beasley states,

"We expect them to follow the handbook. Now, if you'll notice in the handbook, we've got some varied uses of 'shall' and 'will' and 'may.' When the shall is used, it generally is a HUD requirement and is specific." Deposition of Macie Helton and William Beasley, Conducted at 9:30 A.M., on May 19, 1975.

Similarly, Ms. Helton testified that the Handbook "obligates" mortgagees to conform to certain servicing standards. *Id.,* Deposition Conducted at 9:30 A.M., on May 23, 1975, p. 29. These statements are merely examples of many instances in the depositions where both employees indicated that the Handbook was more than advisory. *See* Plaintiffs' Summary of Depositions of HUD Employees, pp. 1–4.

Even more significant with respect to this issue is the fact that HUD's own Assistant General Counsel, Robert Hollister observed that "[i]t was not *legally permissible"* to charge reinstatement fees for legal work not actually performed when a foreclosure action is instituted. Plaintiffs' Exhibit 40, Letter from Mr. Beasley to Mr. Kenneth Wade, Assistant Vice-President, Kassler & Co., Dated May 8, 1975 (Emphasis supplied). Since no source for this requirement exists other than HUD Handbook 4191.1, Mr. Hollister's statement certainly indicates that high level personnel in HUD considered these provisions binding.

Thus, defendants' emphasis on the discretionary nature of many of the Handbook's provisions is not persuasive. As previously stated, this Court does not dispute defendants' assertion that servicers are given some latitude in formulating servicing techniques. But permitting Section 235 participants a certain amount of flexibility in servicing mortgages within settled guidelines and affording them complete freedom to develop their own servicing techniques are two entirely different things. Clearly,

the Handbook establishes at least the parameters of the servicing program to be followed by mortgagees and servicers participating in the Section 235 program.[5]

■ Accordingly, the Court holds that the Handbook imposes mandatory servicing requirements on Section 235 mortgagees and servicers. The question thus becomes whether these requirements are legally binding and therefore enforceable by individual aggrieved mortgagors.

■ This Court has already determined that "while the Handbook need not have been promulgated in compliance with the Administrative Procedure Act because it falls within one of the exceptions to the publication requirement,"[6] it was not published pursuant to the procedural requirements imposed by HUD's own regulations." *See* Order Dated February 4, 1975, pp. 7–9. Section 10.5 of 24 C.F.R. states that the Department ". . . will . . . voluntarily publish in the FEDERAL REGISTER its rules and regulations except those excepted in § 10.4 (where the regulations are concerned 'solely with matters internal to the Department' or are 'of limited interest to the public') or in the last sentence of § 10.5 (where advance publication and notice are 'impracticable, unnecessary, or contrary to the public interest') at least 30 days before their effective date to afford interested persons an opportunity to participate in the formulation of the final language of such rules and regulations through submission of written data, views, or arguments." According to 24 C.F.R. § 10.3(b), rules and

regulations include handbooks. Moreover, it is well-settled that "[w]hen an administrative agency promulgates rules to govern its proceedings, these rules must be scrupulously observed . . . even when the defined procedures are ' . . . generous beyond the requirements that bind such agency.'" *Pacific Molasses Co. v. FTC*, 356 F.2d 386, 389 (5th Cir. 1961). Thus, since the Handbook was never published in the Federal Register, and the Secretary of HUD made no advance determination that complying with the procedural requirements in this case would have been "impracticable, unnecessary or contrary to the public interest," the Handbook itself does not have the force and effect of law.[7] *Accord Mandina v. Lynn*, 357 F.Supp. 269, 279–80 (W.D.Mo.1973).

On the other hand, there is no question that 24 C.F.R § 203.9, requiring lenders to follow "prudent servicing" practices, was published in accordance with the Administrative Procedure Act, 5 U.S.C. § 553, and is legally binding on mortgagees and servicers. Furthermore, a court in interpreting an administrative regulation must accord "the construction given . . . by those responsible for carrying it out . . . great weight and [it] ought not to be overruled without good reason and unless plainly erroneous." *Barrington Manor Apts. Corp. v. United States*, 459 F.2d 499, 502–03, 198 Ct.Cl. 298 (1972); *and see Griggs v. Duke Power Co.*, 401 U.S. 424, 433–36, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). According to the transmittal notice accompanying HUD Handbook 4191.1, the Handbook was intended "[t]o provide lenders with required

**5.** As further support for this position, it should be noted that the Code of Federal Regulations differentiates between Handbooks and Circulars, on the one hand, and Guides, on the other, which are intended to be advisory only. 24 C.F.R. §§ 10.3(c), (d) and (e). This distinction at least suggests that the first category of issuances are meant to be mandatory and not simply advisory in nature.

**6.** As the Court noted in its previous decision: "Generally, administrative regulations in order to have the force and effect of law must be promulgated in accordance with the Administrative Procedure Act, 5 U.S.C. § 553 *et seq.,*

which requires publication of proposed rules in the Federal Register and an opportunity for comment by interested persons before the rules become effective. However, the Act provides an exception to the prior publication and comment requirements when there is involved 'a matter relating to . . . public property, loans, grants, benefits or contracts.'" Order Dated February 4, 1975, p. 8, No. 3.

**7.** Neither party argues that the material in the Handbook is "internal to the Department or of limited interest to the public." 24 C.F.R. § 10.-4.

data regarding the servicing of HUD-insured mortgages." Transmittal Notice No. 1, *accompanying* HUD Handbook 4191.1. Thus, plaintiffs conclude that the Handbook is enforceable against defendants as a valid administrative interpretation of a legally binding regulation.

Although the Handbook does not specifically state that it interprets the "prudent servicing" standard in 24 C.F.R. § 203.9, the Court finds plaintiffs' analysis very persuasive. Clearly, the prudent servicing standard requires more than the procedural standards normally followed in traditional mortgage situations. In Chapter 1, Section 3, the Handbook states, "[a] prudent lender's practices evolve from a broad range of knowledge and sound judgments as well as flexible, far-sighted administration of its servicing responsibilities. The lender is expected to provide competent and aggressive servicing that will result in fewer defaults and foreclosures." HUD Handbook 4191.1, Chapter 1, § 3, p. 2. The servicing responsibilities of lenders involved in the 235 program are briefly described at Section 7 of Chapter 1:

> "Lenders are expected to devise servicing techniques that will enable them to deal effectively with differences in mortgagors. Many complex servicing problems may arise from irregular employment, low income, large families, and a general lack of experience in financial management. A flexible servicing program that recognizes differences in mortgagors' individual characteristics and circumstances minimizes the adverse effects of these problems." *Id.* at § 7, p. 3.

Hence, HUD understood that the servicing practices of lenders involved in the 235 program would differ from those of other lenders because Section 235 mortgagors, unlike conventional mortgagors, have low, often unstable, incomes. If the lenders participating in the Section 235 program were to follow prudent conventional servicing practices, low income mortgagors, who could never have obtained a conventional mortgage in the first place, would frequently lose their homes, thus frustrating the purposes of the Act.

Since Section 203.9 contemplates the use of special servicing techniques without providing any information relating to these techniques, HUD Handbook 4191.1 was obviously essential to aid lenders in properly administering the Section 235 program. The Handbook's provisions expressly relate to the "*servicing* of HUD insured home mortgages," and supply the procedural information necessary to "flesh out" the prudent servicing standard. Transmittal Notice No. 1, HUD Handbook 4191.1, Administration of Insured Home Mortgages, April 18, 1974. Therefore, this Court holds that the Handbook controls the servicing practices of the defendants because it constitutes a valid administrative interpretation of 24 C.F.R. § 203.9.[8] For this reason, plaintiffs are entitled to raise the issue of noncompliance with the Handbook in foreclosure actions instituted by Section 235 mortgagees.

Accordingly, plaintiffs' motion for partial summary judgment on the Handbook issue is hereby GRANTED.

Turning to defendants' contention that plaintiffs' due process claim is moot since they have agreed to waive their contractual right to exercise the power of sale, it appears that defendants' decision to judicially foreclose was not made until after this Court had held by Order dated February 4, 1975, that exercise of a power of sale in this case would be constitutionally imper-

---

**8.** In its *amicus curiae* brief, the Mortgage Bankers Association of Georgia apparently agrees with this position, stating that "[t]he Handbook is an amplification of 24 C.F.R. § 203.9 . . . ." *See* Brief of *Amicus Curiae* Bankers Association of Georgia, p. 5.

Similarly, Mr. Fred W. Pfaender, Director of Loan Management, Office of Assistant Secretary of Housing and Urban Development, states that: "[t]he Handbook is designed for use as a guide and as an advisory interpretation of HUD's regulatory requirement that mortgagees must service insured mortgages 'in accordance with acceptable mortgage practices of prudent lending institutions.'" Affidavit of Fred W. Pfaender, pp. 1–2.

missible. Consequently, defendants' action could hardly be called a "voluntary cessation of allegedly illegal conduct." *United States v. W. T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). However, even if defendants' "waiver" had occurred prior to the Court's decision with respect to the constitutional claim, this case should not be dismissed on the ground of mootness. As the Supreme Court noted in *United States v. W. T. Grant Co., supra,* a claim will be dismissed as moot only when " 'there is no reasonable expectation that the wrong will be repeated.' " *Id.* at 633, 73 S.Ct. at 897, *quoting United States v. Aluminum Co.,* 148 F.2d 416, 448 (2d Cir. 1945). Here, defendants do not aver that powers of sale will no longer be used in Section 235 mortgages. In fact, at an oral hearing on plaintiffs' motions for reconsideration of the Handbook issue and for class certification, defendants' counsel stated that defendants intended to continue use of powers of sale at least with respect to mortgagors who could not be located. Transcript of Hearing Held May 5, 1975, p. ——. Thus, contrary to defendants' assertion, it is clear that the constitutional questions relating to the exercise of the private power of sale are not moot, and defendants' motion to dismiss on this ground must be denied.[9]

For the reasons stated in this Order, plaintiffs' motion for partial summary judgment is GRANTED, and DEFENDANTS' motion to dismiss is DENIED.

---

**9.** Defendant FNMA apparently attempts to relitigate the due process issue in a brief filed with this Court on May 5, 1975. However, this issue was determined adversely to the defense in the Court's Order of February 4, 1975, and, as stated by the Court at the oral hearing, will not be re-examined. Transcript of Hearing Held May 5, 1975, p. ——.